<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                        :
ST. MATTHEW'S BAPTIST CHURCH,           :        Civil Action No. 04-4540 (FLW)
                    Plaintiff,          :
                                        :        OPINION
          v.                            :
                                        :
WACHOVIA BANK NATIONAL                  :
ASSOCIATION f/d/b/a FIRST UNION         :
NATIONAL BANK                           :
                    Defendants          :
                                        :
_____:

**APPEARANCES:**

For Plaintiff:                          For Defendant:
Douglas E. Burry                        Joseph A. Martin
Cohen, Seglias, Pallas, Greenhall & Furman, PC     Archer & Greiner, PC
2 White Horse Pike                      One Centennial Square
Haddon Heights, NJ 08035                Haddonfield, NJ 08033

**WOLFSON**, **District Judge**

This matter comes before the Court on Defendants' Motion to Dismiss Plaintiff's

Complaint pursuant to <u>Fed. R. Civ. P.</u> 12(b)(6).  For the reasons stated herein, Defendants'

Motion will be granted, with a limited right to replead as to Wachovia's calculation of the

termination fee.

## I.    BACKGROUND

In 1997, Plaintiff St. Matthews's Baptist Church ("St. Matthew's") decided to construct a

new administrative wing and community development center.  Complaint ("Compl.") at ¶ 8.

Plaintiff received a short term construction loan for $3,172,000.00 from Wachovia, f/d/b/a

CoreStates Bank and First Union National Bank ("Wachovia"),[1] to finance construction of the

expansion.  Id. at 10.

Because of the high interest rate associated with the Short Term Loan, Plaintiff sought to

refinance its existing debt by converting the Short Term Loan into a permanent five-year long

term loan in the amount of $5,055,048.97.  Id. at ¶ 11.  When the Church met with Wachovia in

February, 2000 to discuss approval for the Long Term Loan, it requested a fixed interest rate

loan, feeling that it "would not be able to meet its debt service obligations with a high fluctuating

interest rate."  Id. at ¶ 13.  The Church alleges that Wachovia informed it that it did not qualify

for a fixed interest rate.  Id.  Instead, Wachovia suggested and that the Church should consider

using a floating loan with a fixed rate hedge that would protect the Church against the risk of

rising interest rates, also known as an "interest rate swap agreement."  Id.  The Church and

Wachovia entered into this Interest Rate Swap Agreement ("Swap Agreement") on February 9,

2000.  Id. at ¶ 25.

An interest rate swap agreement like the one that existed between the Church and

Wachovia is a contractual arrangement that sets a maximum interest rate that a borrower is

required to pay on a loan.  The parties to the Agreement agree to exchange interest payments on

specific dates on a defined principal amount for a fixed period of time, according to a

predetermined formula.  Id. at ¶ 19.  The principal amount, which is never exchanged, is referred

to as the "notional" amount.  Id.  If the floating rate drops below the fixed rate, the borrower

---

[1]For ease of reference, the Court will refer to CoreStates and First Union as "Wachovia" throughout its Opinion, even though the Defendant may have been operating as one of these other entities at the relevant point in time.

owes the difference between the floating rate and the fixed rate, multiplied by the notional amount, to the bank.  Id. at ¶ 21.  If the floating rate exceeds the fixed rate, however, the borrower receives the benefit of the fixed rate.  Id.  The floating interest rate for the Swap Agreement is tied to the London Interbank Offered Rate ("LIBOR").  Def. Exh. 4 at 1.

The Swap Agreement is governed by a "Master Agreement" and two "Confirmation" documents.  Compl. at ¶ 22.  The Master Agreement and Schedule, dated February 9, 2000, is a standard form agreement prepared by the International Swaps and Derivatives Association ("ISDA"), and includes all provisions generally applicable to swap transactions.  Id., Def. Exh. 1.  Pursuant to the Swap Agreement, the Church agreed to pay a fixed rate of 9.13% over a term of five years in exchange for Wachovia's payment of a rate equal to LIBOR plus 1.5%.  Compl. at ¶ 25.  The notional amount was the amount of the loan, $5,055,048.97.  Id.

The Confirmation and Amended Confirmation are dated February 22, 2000 and April 20, 2000, respectively.  Def. Exh. 2, 3.  The April 20, 2000 Amended and Restated Swap Transaction Confirmation, amended certain terms of the February 22, 2000 Confirmation, which otherwise remained in effect.   Compl. at ¶ 29, Def. Exh. 3 at 1.  Also on April 20, 2000, the parties executed a Promissory Note ("Note"), under which Wachovia agreed to loan $5,055,048.97 to the Church.  Id. at ¶ 26.  The floating interest rate on the Note was calculated "at a rate equal to 1-month LIBOR plus one hundred fifty percent (150%) per annum."  Def. Exh. 4 at ¶ 1.

Approximately two years later, after making twenty-four 24 monthly payments, the Church considered pre-paying its loan to Wachovia in order to refinance with another lender and receive a more favorable interest rate.  Compl. at ¶ 30.  The Church alleges that it then learned, for the first time, that if it chose to pre-pay the Note and terminate the Swap Agreement, the Church

would have to pay a "termination fee," or pre-payment penalty.  Id. at ¶ 31-32.  The Church alleges that Wachovia represented in February 2000 that the Swap Agreement would provide benefits not available with a fixed rate loan, and that in the event that the Church cancelled the Swap, the Church may have to pay an "unwind fee," which would be smaller than a standard prepayment penalty on a fixed rate bank loan.  Id. at ¶ 17.  It further alleges that it was never disclosed that the Church would incur any fee or penalty if it opted to prepay the amount owed under the Swap Agreement, or the manner in which any prepayment penalty would be calculated and assessed by Wachovia.  Id. at ¶ 23.  Plaintiff believes that not only was the formula used to calculate the penalty of $502,330.00 unknown to the Church, it is also unsupported by the Swap, Note, or any other documents executed by the Church, and was therefore arbitrary and capricious, as well as unconscionable.  Id. at ¶ 34, 38.

## II.   PROCEDURAL HISTORY

Plaintiff filed the instant action in the Superior Court of New Jersey, Gloucester County, Law Division, Docket # Glo-L-1231-04, on August 6, 2004.  The Complaint alleges (1) fraudulent misrepresentation, (2) negligent misrepresentation, (3) unfair competition and false advertising, (4) unjust enrichment and restitution, (5) breach of fiduciary relationship, (6) breach of the implied duty of good faith and fair dealing, (7) and violations of § 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934.  Defendant removed the action to this Court by Notice of Removal dated September 20, 2004.  This Court's jurisdiction is predicated on 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 1331.  Defendant moves to dismiss the Complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

### III.    DISCUSSION

#### A.    Motion to Dismiss Standard

In considering Defendants' Motion to Dismiss for failure to state a claim pursuant to <u>Fed. R. Civ. P.</u> 12(b)(6), the Court accepts as true all of the factual allegations contained in Plaintiff's complaint and any reasonable inferences that can be drawn therefrom.  <u>Nami v. Fauver</u>, 82 F.3d 63, 65 (3d Cir. 1996).  A claim should be dismissed pursuant to Rule 12(b)(6) only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief."  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-6 (1957).  However, a "court need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." <u>Morse v. Lower Merion School District</u>, 132 F.3d 902, 906 (3d Cir. 1997).

In deciding Defendants' Motion to Dismiss pursuant to <u>Fed. R. Civ. P.</u> 12(b)(6), the Court may consider the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of Plaintiffs' claim.  <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 222 n.3 (3d Cir. 2004).  A document forms the basis of a claim if it is "integral or explicitly relied on in the complaint."  <u>Id.</u>, citing <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir. 1997).  To the extent that Plaintiff's allegations are contradicted by the documents attached to the Complaint upon which its claims are based, the Court need not accept such allegations as true.  <u>See</u> <u>Genesis Bio-Pharmaceuticals, Inc. v. Chiron Corp.</u>, 27 Fed. Appx. 94, 99-100 (3d Cir. Jan. 10, 2002)  (unpublished decision); <u>Doug Grant, Inc. v. Greate Bay Casino Corp.</u>, 232 F.3d 173, 183-84 (3d Cir. 2000); <u>Centrella v. Barth</u>, 633 F. Supp. 1016, 1019 (E.D.Pa.1986)

.

###### B.       Choice of Law

The April 20, 2000 Amended Swap Transaction Confirmation provides that "[u]nless otherwise provided in the Master Agreement, this Confirmation is governed by the law (and not the law of conflicts) of the State of New York."  Def. Exh. 3 at 2.  As such, Defendants argue New York applies to all of Plaintiff's claims.

Plaintiff argues that Section 13.13 of the Note, which states that "[t]his Note shall be governed by and construed in accordance with the substantive laws of the State of New Jersey without reference to conflict of laws principles," creates a conflict as to which state's law should control.  Without performing a choice of law analysis or citing to appropriate authority, Plaintiff argues that New Jersey law should apply because: (1) the Church is seeking damages based upon misrepresentations and non-disclosures that occurred in New Jersey; (2) both parties maintain New Jersey offices; (3) New Jersey was the site of all communications relating to the execution of the Note and Swap Agreement, and was in fact the site of the execution of the Note and Swap Agreement.

A district court's choice of law determination is governed by the rules of the forum state. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); On Air Entm't Corp. v. Nat'l Indem. Co., 210 F.3d 146,149 (3d Cir. 2000); Shields v. Consol. Rail Corp. 810 F.2d 397, 399 (3d Cir. 1987).  However, before a choice of law question arises, there must be an actual conflict between the potentially applicable bodies of law.  On Air, 210 F.3d at 149 (3d Cir. 2000) (citing Lucker Mfg. v. Home Ins. Co., 23 F.3d 808, 813 (3d Cir. 1994)).  The parties have not presented any differences between the New York and New Jersey law relevant to this case, and the Court has not identified any relevant differences.  As such, there is no conflict of law, and the Court is to avoid

the choice of law question.  Id.  Thus, the Court can, and will, refer interchangeably to the laws of New York and New Jersey in discussing the law applicable to the case.  Id.

        C.      **Fraudulent and Negligent Misrepresentation**

To state a claim for fraudulent misrepresentation under New York law, a plaintiff must show that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."  Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 186-87 (2d Cir. 2004) (quoting Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146, 153 (2d Cir.1995)).  The elements of a negligent misrepresentation claim under New York law are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known as incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment."  Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000).

The elements of common-law fraud under New Jersey law are: (1) material misrepresentation of presently existing or past fact; (2) knowledge or belief by defendant of its falsity; (3) intention that other person rely on representation; (4) reasonable reliance thereon by other person; and (5) resulting damages.  Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997) (citing Jewish Ctr. of Sussex County v. Whale, 86 N.J. 619, 624-25 (1981)).  To prevail on a negligent misrepresentation claim in New Jersey, a plaintiff must prove that the defendant

negligently made an incorrect statement, upon which the plaintiff justifiably relied.  <u>Condus v. Howard Sav. Bank</u>, 781 F. Supp. 1052, 1054 (D.N.J. 1992).

Thus, under both New York and New Jersey law, the plaintiff is required to allege reasonable reliance on the alleged misrepresentation in order to state a claim for either fraudulent or negligent misrepresentation.  Defendant argues that the Swap Agreement and Note both contain merger and integration clauses that prevent Plaintiff from demonstrating reliance.[2]  Plaintiff contends, in response, that courts will routinely refuse to dismiss claims that written agreements

---

[2]The Swap Agreement itself provides that it "*constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto*."   Def. Exh. 1 at ¶ 8(a) (emphasis added).  In addition, the attached Schedule to the Master Agreement amends Section 3 of the Swap Agreement ("Representations") with the following "additional representations":

> [Each party represents to the other party that:] (e) for any Relevant Agreement:... (ii) it acknowledges that the other party acts only at arm's length and is not its agent, broker, advisor or fiduciary in any respect, and any agency, brokerage, advisory or fiduciary services that the other party (or any of its affiliates) may otherwise provide to the party (or to any of its affiliates) excludes the Relevant Agreement; (iii) *it is relying solely on its own evaluation of the Relevant Agreement (including the present and future results, consequences, risks, and benefits thereof, whether financial, accounting tax, legal, or otherwise) and upon advice from its own professional advisors,* (iv) it understands the Relevant Agreement and those risks, has determined they are appropriate for it, and willingly assumes those risks, and (v) *it has not relied and will not be relying upon any evaluation or advice (including any recommendation, opinion, or representation from the other party, its affiliates or the representatives or advisors of the other party or its affiliates (except representations expressly made in the Relevant Agreement or an opinion of counsel required thereunder.)* (emphasis added).

> "Relevant Agreement" means this Agreement, each Transaction, each Confirmation, any Credit Support Document, and any agreement (including any amendment, modification, transfer or early termination) between the parties relating thereto or to any Transaction.

The Note also contains an integration clause, stating that "this Note and the other Loan Documents constitute the sole agreement of the parties with respect to the transaction contemplated hereby and *supersede all oral negotiations and prior writings with respect thereto*."

-8-

were fraudulently induced, even where merger and integration clauses are included in the agreements.

General merger and integration clauses and disclaimers of reliance are insufficient to prevent the introduction of parol evidence of misrepresentations in both New York and New Jersey.  The Court finds that the merger and integration clauses in the Swap Agreement would be characterized as general, and would not alone suffice to prevent evidence of allegedly fraudulent representations.  See, e.g., Caiola v. Citibank, N.A., New York, 295 F.3d 312, 330 (2d Cir. 2002) (quoting Grumman Allied Indust., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 735 (2d Cir. 1984)) (disclaimer must be "track[] the substance of the alleged misrepresentation"); Chase v. Columbia Nat'l Corp., 832 F. Supp 654, 662 (S.D.N.Y. 1993) (holding that merger clause stating that the Agreement "contains the complete agreement of the parties and supersedes all prior agreements and understandings between the parties relating to the subject matter of this Agreement" was "only contractual boilerplate" and was too general to preclude evidence of fraud in the inducement); Travelodge Hotels, Inc. v. Honeysuckle Enter., Inc., 357 F. Supp.2d 788, 795-96 (D.N.J. 2005) (holding that Agreement providing that "[n]either we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement" was not sufficiently specific to prevent parol evidence of fraud.)

In both jurisdictions, however, alleged misrepresentations that contradict the express words of a written instrument are inadmissible to avoid an obligation knowingly assumed.  DH Cattle Holdings Co. v. Reno, 196 A.D.2d 670, 673, 601 N.Y.S.2d 714, 717 (N.Y. App. Div. 1993) (citations omitted); Travelodge Hotels, Inc., 357 F. Supp.2d at 795-96 (D.N.J. 2005).  See also

McConkey v. AON Corp., 354 N.J. Super. 25, 49-50 (App. Div. 2002); Alexander v. CIGNA
Corp., 991 F. Supp. 427, 437-38 (D.N.J. 1998); Filmlife, Inc. v. Mal "Z" Ena, Inc., 251 N.J. Super
570, 575 (App. Div. 1991); Peterson v. Mister Donut of America, Inc., 1988 WL 1734, at *5
(D.N.J. July 6, 1988).

Here, Plaintiff alleges that "with respect to the Church's possible cancellation of the
agreement, Wachovia instructed the Church that, in the event that the Church would cancel the
Swap, the Church might, at worst, have to pay an 'unwind fee' which, according to Wachovia
would be smaller than a standard prepayment penalty on a fixed rate bank loan." Compl. at ¶ 17.
Plaintiff further alleges that Wachovia never disclosed, either verbally or in writing, that the
Church would incur any fee or penalty in the event of prepayment, or the manner in which any
prepayment penalty would be calculated. Id. at ¶ 23. Plaintiff submits that the provisions of the
Master Agreement relating to payments due and owing upon "Events of Default" or "Termination
Events" do not apply to prepayment. Id. at ¶¶ 24, 35.

Plaintiff's arguments are expressly contradicted by the terms of the governing documents
of the Agreement (which includes the Master Agreement and February 22, 2000 and April 20,
2000 Confirmations) and the Note.[3] The Master Agreement, dated February 9, 2000, provides in
Section 2(a), that "[e]ach party will make *each payment or delivery specified in each
Confirmation* to be made by it, subject to the other provisions of this Agreement," and that

---

[3]The February 22, 2000 Confirmation provided that payment dates occur "[m]onthly on
the 20th day of each month commencing April 20, 2000, through and including the Termination
Date." Id. The termination date was initially set for March 21, 2005. Id. The Amended
Confirmation changed the first payment date to May 20, 2000 and extended the Termination
Date to April 20, 2005. Id. and Def. Exh. 3 at 1.

"[p]ayments under this Agreement *will be made on the due date* for value on that date in the place of the account specified in the relevant Confirmation..."  (emphasis added).  Def. Exh. 1. at 1.

The February 22, 2000 Swap Transaction Confirmation specifically provides, in relevant part, that the Counterparty, defined as St. Matthews Baptist Church,

> *hereby acknowledges that the payments due by it under this Transaction shall be due on their respective due dates whether or not (i) there exists at any time a commitment for any Financing or any such commitment expires or terminates... (iii) any advance is made, outstanding or repaid in connection with any Financing, either before, or on or after the Effective Date, ... or (v) the principal amount of any Financing is less or more than the Notional Amount of this Transaction, the term of Financing is shorter or longer than the Term of this Transaction, or any other terms of any Financing differ from the terms of this Transaction. "Financing" means any loan or other extension of credit from First Union (or any other entity) to Counterparty (or any other entity).*  In addition, Counterparty acknowledges that its obligations in respect of this Transaction upon the occurrence of any Event of Default, Termination Event or Additional Termination Event shall be due and payable by Counterparty whether any such event occurs before, on or after the Effective Date.

> Def. Exh. 2 at 1 (emphasis added).

Thus, the Master Agreement and Confirmation clearly contemplate the requirement that the borrower make payments on the specified due dates according to the agreement regardless of whether or not there exists any continued commitment for financing, including repayment prior to the Effective Date.

In addition, the Note contains a provision addressed to the Church's obligations under the Swap Agreement in the event of pre-payment:

> PREPAYMENT.  The Loan may be prepaid, in whole or in part, at any time and from time to time... *Nothing herein shall be deemed to alter or affect any obligations that Borrower may have to Bank under any interest rate swap agreements.*

> Def. Exh. 4 at ¶ 6.

-11-

This provision also clearly contemplates that even if the Note was repaid in advance of the Termination date, obligations that the Borrower has to the Bank under interest rate swap agreements would still remain.

Plaintiff's decision to "prepay the note and terminate the Long Term Loan," thereby failing to make continued payments as specified by the Agreement, thus constituted an Event of Default:

> Any of the following events constitutes an event of default...(i) *Failure by the party to make, when due, any payment under this Agreement*... (ii) Failure by the party to comply with or perform any agreement or obligation... to be complied with or performed by the party in accordance with this Agreement...."

Master Agreement Section 5(a).

The Agreement clearly delineates the procedure to be followed by the Defendant in an Event of Default.  Section 6(a) of the Agreement states that if "at any time an Event of Default with respect to a party... has occurred," the non-defaulting party may designate an "Early Termination Date." Section 6(e) states that "[i]f an Early Termination Date occurs, [the provisions set forth in this section] shall apply based on the parties' election in the Schedule of a payment measure, either 'Market Quotation' or 'loss', and a payment method...."   Section 6(d) ("Calculations") provides the method as to how the Payments on Early Termination, as specified in Section 6(e), are to be calculated.  Specifically, Section 6(d)(1) provides that:

> On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid.  In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

At some point, Wachovia notified the Church the termination value was calculated as follows:

> The termination value was determined by subtracting the new market rate for the remaining life of the transaction (5.44%) from the fixed rate existing transaction (9.13%). This percentage difference is them multiplied by the notional principal amount for each of the remaining 36 payment periods. Each of these 36 monthly payment streams are then discounted to the present value, using the specific discount rate for each of the 36 periods.

Compl. at ¶ 33.[4]

Thus, the alleged misrepresentations are inadmissible because they are expressly contradicted by the terms of the Agreement. As such, Plaintiff is unable to demonstrate reliance upon these representations, a necessary element of claims for fraudulent and negligent misrepresentation. Moreover, "parties cannot alter or contradict the express terms of one specific provision of an integrated contract in writing... by pointing to parole [sic] evidence of [fraud or mutual mistake], where the party... does not dispute other relevant provisions of the contract and in effect concedes their validity." Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc., 111 F. Supp. 2d 450, 456 (S.D.N.Y. 2000) (citations omitted). Here, Plaintiff contests only that the Swap Agreement does not support a termination fee, but does not contest that the payments made up until the time that it decided to terminate the loan were made other than pursuant to a valid

---

[4]The Complaint does not reference the document that ¶ 33 of the Complaint is drawn from, nor is it attached as an exhibit to the Complaint or either party's briefing of this Motion.

agreement.[5]  For the foregoing reasons, the Court will dismiss Plaintiff's claims for fraudulent and

negligent misrepresentation.[6]

### D.     Unjust Enrichment and Restitution

Defendant also moves to dismiss Plaintiff's unjust enrichment claim based on the

existence of a valid express contract between the parties.  Where there is an express contract

covering the identical subject matter of the claim, plaintiff cannot pursue a quasi-contractual claim

for unjust enrichment.  Winslow v. Corp. Express, Inc., 364 N.J. Super. 128, 143 (App. Div.

2003); Apfel v. Prudential-Bache Securities, Inc., 81 N.Y.2d 470, 479, 600 N.Y.S.2d 433, 437,

616 N.E.2d 1095, 1098-99 (N.Y. 1993).

---

[5]Although the Court has some concerns regarding whether the $502,330.00 fee was actually assessed in accordance with Section 6 of the Agreement, as discussed more fully in Section III.F, infra, these concerns do not change the fact that Plaintiff cannot state a claim for fraudulent or negligent misrepresentation.  Where the Plaintiff has acknowledged the validity of the Agreement, and the express terms of the Agreement contradict Plaintiff's claims that a termination fee and the manner in which it would be calculated were not disclosed at all, parol evidence may not be admitted to show that the Agreement itself was induced by misrepresentations.

[6]In addition, Plaintiff fails to state a claim for fraudulent misrepresentation based on its failure to plead that claim with particularity pursuant to Fed. R. Civ. P. 9(b).  This requirement may be satisfied by "pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004).  A plaintiff also must allege who made a misrepresentation to whom and the general content of the misrepresentation.  Id. (citations omitted).  See also Harsco Corp. v. Segui, 91 F.3d 337,347 (2d Cir. 1996) (requiring plaintiff to "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."). Plaintiff fails to identify who made the false representations and when and where the statements were made, or otherwise more precisely substantiate its claim of misrepresentation on the part of Wachovia representatives.

Plaintiff argues that its unjust enrichment claim should not be dismissed because it alleges that none of the contractual documents make reference to any prepayment penalty.  Plaintiff therefore argues that its claim for restitution of the prepayment penalty is therefore extra-contractual.  Although it is unclear from Plaintiff's brief, Plaintiff appears to cite VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554-55 (1994), for the proposition that even where there is a contract, if an additional benefit was conferred upon the defendant "beyond its contractual rights," (as it argues that the "prepayment penalty" was here) a plaintiff can state a claim for unjust enrichment.  Id. at 554 ("The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.").

In VRG Corp., the issue was whether a commercial real estate broker ("VRG"), which earned commissions from obtaining long-term tenants for a shopping-center owner ("Golden Reef"), could impose an equitable lien on the rental income derived from those tenants following the sale of the shopping center to a new owner ("GKN"), who had not agreed to be responsible for such commissions.  Id. at 542-44.  The "contractual rights" referred to were those conferred in the contract of sale of the shopping center between Golden Reef and GKN.  In contrast to the instant action, there was no contract between the plaintiff and the party alleged to have been unjustly enriched.  Id.  Thus, VRG Corp. does not support Plaintiff's contention that it can state a claim for unjust enrichment.  See also Seiden Assoc., Inc. v. ANC Holdings, Inc., 754 F. Supp. 37, 40 (S.D.N.Y. 1991) ("While the existence of an enforceable contract between the parties will prevent recovery in quasi-contract, as between those parties... the mere existence of a written contract

-15-

governing the same subject matter does not preclude such recovery from non parties so long as the other requirements for quasi contracts are met.") (internal citations omitted).

Here, as discussed in Section III.C., *supra*, the Swap Agreement clearly contemplates that Plaintiff was liable for payments for the duration of the Agreement, regardless of the existence or amount of the principal amount of financing.  It further contemplates that Plaintiff's failure to continue making payments according to the terms of the agreement would constitute an Event of Default, and specifies how payments are to be calculated upon such an occurrence.  As such, although the documents do not reference a prepayment fee, *per se*, the Court finds that the Agreement explicitly addresses Plaintiff's claims.

Plaintiff also argues that dismissal of its unjust enrichment claim would be premature because it is allowed to plead alternative theories of recovery.  In cases allowing Plaintiff to proceed on an unjust enrichment theory where a contract between the parties exists, there is generally some measure of dispute about the validity of the contract.  See, e.g., Caputo v. Nice-Pak Products, Inc., 300 N.J. Super. 498, 504-05 (App. Div. 1997) (approving submission of unjust enrichment and contract claims to jury so that jury could decide whether plaintiff can recover for unjust enrichment if it found that there was no valid contract); The Prudential Ins. Co. of Am. Sales Pratices Litig., 975 F. Supp. 584, 621-22 (D.N.J. 1997) (permitting plaintiffs to go forward on a motion to dismiss because "if the written document is unenforceable, the plaintiffs may have an unjust enrichment claim.").  However, "quasi-contract liability will not be imposed when a valid, unrescinded contract governs the rights of the parties."  Duffy v. Charles Schwab & Co., Inc., 123 F. Supp.2d 802, 814 (D.N.J. 2000)(citations omitted).   See also Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389, 516 N.E.2d 190, 521 N.Y.S.2d 653 (N.Y. 1987).

For the reasons stated in Part III.C, *supra*, Plaintiff is unable to plead that the Agreement was fraudulently induced, and no rescission is sought.  Plaintiff's claim of unjust enrichment is based solely on its argument that none of the contractual documents reference a termination fee. Because the Agreement covers the rights of the parties to receive payments pursuant to the Agreement and the method of calculation, the Court finds that Plaintiff does not state a claim for unjust enrichment.

### E.      Breach of Fiduciary Relationship

Defendant also moves to dismiss Plaintiff's claim for breach of fiduciary duty, arguing that Plaintiff is unable to establish that Defendant was acting as a fiduciary when Plaintiff entered into the Swap Agreement.  In order to establish a cause of action for a breach of fiduciary duty in New Jersey, a plaintiff must show that the defendant had a duty to the plaintiff, that the duty was breached, that injury to plaintiff occurred as a result of the breach, and that the defendant caused that injury.  In re ORFA Sec. Litig., 654 F. Supp. 1449, 1457 (D.N.J. 1987).  Under New York law, plaintiff must demonstrate: (1) a breach by a fiduciary of an obligation owed to plaintiff; (2) defendant's knowing participation in the breach; and (3) damages resulting therefrom.  SCS Communications Inc.  v. Herrick Co., Inc. 350 F.3d 329, 342 (2d Cir. 2004).  Thus, in both jurisdictions, in order to establish a breach of fiduciary duty, a plaintiff must first show that there was a fiduciary relationship.

It is well-settled that the relationship between a bank and its customer is a debtor-creditor relationship that does not ordinarily give rise to a fiduciary duty.  United Jersey Bank v. Kensey, 306 N.J. Super. 540, 552 (App. Div. 1997) (collecting authority); Forbes v. First Camden Nat. Bank & Trust Co., 25 N.J. Super. 17, 20-21 (App. Div. 1953); Aaron Ferer & Sons Ltd. v. Chase

Manhattan Bank, N.A., 731 F.3d 112, 122 (2d Cir. 1984) (citations omitted); ADT Operations v. Chase Manhattan Bank, N.A., 173 Misc. 2d 959, 967, 662 N.Y.S.2d 190 (N.Y. Sup. Ct. 1997) (collecting authority). "As a general proposition, creditor-debtor relationships rarely give rise to a fiduciary duty 'inasmuch as their respective positions are essentially adversarial.'"  New Jersey Econ. Dev. Auth. v. Pavonia Rest., Inc., 319 N.J. Super. 435, 446 (App. Div. 1998) (citations omitted).

      In both jurisdictions, a fiduciary relationship arises only in cases in which one of the parties "'expressly reposes a trust or confidence in the other' or because of the circumstances 'such a trust or confidence is necessarily implied.'"  United Jersey Bank, 306 N.J. Super. at 553.  See also Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 318 (2d Cir. 1993) ("in unusual circumstances, a fiduciary relationship may arise even between a bank and a customer if there is either 'a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding,' or an assumption of control and responsibility.") (internal citations omitted).  The "mere fact that a corporation has borrowed money from the same bank for several years is insufficient to transform the relationship into one in which the bank is a fiduciary."  Id.

      Thus, banks and other lending institutions have been held liable to their customers only "for gross acts of misconduct and deceit," or where "the lender encouraged the borrower to repose special trust or confidence in its advice, thereby inducing the borrower's reliance"  United Jersey Bank, 306 N.J. Super at 554-55.  The United Jersey Bank court listed three examples of such cases, which it described as involving "egregious breaches of the lender's duty of good faith and fair dealing": (1) a bank's encouragement of investment with another one of the bank's customers with knowledge of that customer's involvement in a "check kiting scheme" and its substantially

overdrawn checking account; (2) a bank's continuous pressure on one customer to enter into transactions with a customer company on verge of bankruptcy, giving an appraisal of that company's net worth that was knowingly inaccurate; and (3) a bank's encouragement of a customer to purchase machinery from another customer by falsely representing the other customer's financial condition.  Id. at 555-57.

Plaintiff argues that its allegations in the Complaint suffice to establish a fiduciary relationship because (1) Wachovia possessed highly specialized knowledge with respect to swap agreements; (2) the Church was an unsophisticated borrower that relied on this expertise; and (3) the Church placed its trust and confidence in Wachovia.  Plaintiff's allegations are insufficient to establish that its relationship with the Bank was outside the realm of the normal debtor-creditor relationship.  First, the Complaint does not sufficiently allege grossly unequal bargaining power.  Although Plaintiff submits that its counsel in the instant lawsuit did not represent the Church in connection with the execution of the Note and the Swap Agreement, it does not submit that it did not retain counsel that had familiarity with swap agreements to advise the Church, or that it was unable to do so.  Plaintiff similarly does not allege facts demonstrating that the Bank was in a position to exercise control over the Church's decision to enter into the agreement, or any other facts that distinguish the instant case from the normal debtor-creditor relationship.

Plaintiff's heavy reliance upon Kronfeld v. First Jersey Nat'l Bank, 638 F. Supp. 1454, 1467 (D.N.J. 1986) to demonstrate the fiduciary duty of a bank is misplaced.  In that case, the defendants were broker/dealers and banks that sold municipal bonds to plaintiffs.  The Kronfeld court specifically relied on a line of cases holding that a "stockbroker may have a quasi-fiduciary

duty toward his customer," and as such, presented a relationship different from the typical debtor-creditor relationship between a bank and its customer.  Id.

The Court therefore finds that no fiduciary relationship existed between Wachovia and the Church.  Moreover, the Schedule to the Swap Agreement specifically disclaims the existence of a fiduciary relationship.  See supra n.3.  Explicit contractual waivers of fiduciary relationships are enforceable.  Asian Vegetables Res. and Development Ctr. v. Institute of Int'l Educ., 944 F. Supp. 1169, 1178 (S.D.N.Y. 1996) (holding that where contract clearly and unambiguously disclaimed a fiduciary relationship, no fiduciary relationship existed as a matter of law); Union Carbide Corp. v. Montell N.V., 1998 WL 293991, at *7 (S.D.N.Y. June 5, 1998).  Plaintiff's claim for breach of fiduciary duty therefore must be dismissed.

### F.     Breach of Implied Duty of Good Faith and Fair Dealing

Under both New York and New Jersey law, a covenant of good faith and fair dealing is implied in every contract.  Sons of Thunder, Inc. v. Borden, 148 N.J. 396, 420 (1997); Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977 (N.Y. 1995).  This covenant supposes that neither party to a contract "shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Id. (citations omitted).  However, the "implied duty of good faith and fair dealing does not operate to alter the clear terms of an agreement and may not be invoked to preclude a party from exercising its express rights under such an agreement."  Fields v. Thompson Printing Co., 383 F.3d 259, 271 (3d Cir. 2004) (interpreting New Jersey law, citations omitted); Murphy v. Am. Home Prod. Corp., 58 N.Y.2d 293, 304 (N.Y. 1983).

Plaintiff's good faith and fair dealing claim is based on the alleged inconsistency of the termination fee with the terms of the Agreement and Note.  As already discussed, the Court finds that Defendant was entitled to continued payments under the Agreement, regardless of whether or not there was a continued loan in effect, and the implied duty of good faith and fair dealing thus may not be invoked to prevent Defendant from exercising the right to receive payments as specified in the Agreement.  As to the *amount* of payment, however, the Court is troubled by ¶¶ 33-34 and ¶ 36 of Plaintiff's Complaint as pled, and Defendant's failure to meaningfully respond to these allegations.  In these paragraphs, Plaintiff sets forth the manner in which Wachovia determined the amount of the termination fee.  The Court is not in possession of Plaintiff's Exhibit D, referenced in ¶ 36, as it was not attached to the Notice of Removal or any other pleading.  The Court therefore has no basis for determining whether the $502,330.00 fee was assessed in accordance with Section 6 of the Agreement. In particular, the language in ¶ 36, that the "termination value" was "something that the Church and WBNA would separately negotiate" raises the possibility that this payment may not have been dictated by the Agreement.

Thus, the Court is unable to determine the context of ¶¶ 33 and 36 of the Complaint, and therefore is unable to determine whether the formula referenced in ¶ 33 and the negotiation referenced in ¶ 36 were authorized by the Agreement.  Since the Court cannot discern the claim being asserted by Plaintiff, it will therefore dismiss Plaintiff's good faith and fair dealing claim without prejudice and give Plaintiff leave to replead this claim within thirty (30) days.  If Defendant can demonstrate in response to any amended pleading that the fee described in ¶ 33 of the Complaint was assessed in a manner dictated by the Agreement, Plaintiff's good faith and fair dealing claim would be barred.  On the other hand, the Court notes that if the negotiation described

-21-

in ¶ 36 resulted in a separate written agreement, or in fact was not governed by any written agreement, Plaintiff's amended pleading may state a claim for other than good faith and fair dealing under the Swap Agreement, and instructs Plaintiff to replead the claim as appropriate.  The Court is granting Plaintiff leave to replead a claim as to the calculations of the termination fee only, and not with regard to the imposition of a such a fee.

### G.    Federal Securities Violations

Plaintiff also alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b.  To state a claim under § 10(b) and Rule 10b-5, plaintiffs are required to plead that a particular defendant: (1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury.  Semerenko v. Cendant Corp., 223 F.3d 165, 174 (3d Cir. 2000); Caiola v. Citibank, N.A., 295 F.3d 312, 321 (2d. Cir. 2002).  Standing to sue under § 10(b) and Rule 10b-5 is limited to purchasers and sellers of securities.  Caiola, 295 F.3d at 222; In re Cendant Corp. Sec. Litig., 81 F. Supp. 550, 555 (D.N.J. 2000).   A "security" is defined in Section 3(a)(10) of the Exchange Act as "any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof..."  15 U.S.C. §  78c(a)(10).

Defendant moves to dismiss Plaintiff's federal securities claims because of Plaintiff's failure to allege that fraud was committed "in connection with the purchase or sale of any security."  Congress specifically addressed the general confusion regarding whether swap agreements were to be considered securities for the purpose of the Exchange Act in passing the

Commodities Futures Modernization Act of 2000 ("CFMA"), Pub. L. No. 106-554, 114 Stat. 2763.

Title III of the CFMA, entitled "Legal Certainty for Swap Agreements," distinguished between

security-based and non-security-based swap agreements.  A Swap Agreement is defined in Section

206A(3) as including "any such agreement, contract or a transaction known as an interest rate

swap...."  Section 206B of the CMFA defines "security-based swap agreement":

> As used in this section, the term 'security-based swap agreement' means a swap agreement (as defined in section 206A) of which a material term is based on the price, yield, value or volatility of any security or any group or index of securities, or any interest therein."

Section 206C defines non-security-based swap agreement as any agreement that is not a

security-based swap agreement as defined by Section 206B.  Because Section 303(a) of the CFMA

exempts non-security based swap agreements from the definition of "security," and Section 303(d)

amends § 10(b) to include the CFMA definition of "securities-based swap agreement," a non-

security based swap agreement is not actionable under § 10(b) or Rule 10b-5 because it is neither a

"security," nor a "securities-based swap agreement."  The amended § 10(b) reads as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange–
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, *or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act)*, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (emphasis added).[7]

---

[7]A non-security-based swap agreement similarly is not actionable under Rule 10b-5, adopted by the SEC pursuant to Section 10(b) of the Exchange Act, which states that:

Plaintiff here argues, however, that because the interest rate under the Swap Agreement is tied to LIBOR, the "material term" referenced in Section 206B of the CFMA is "based on the price, yield, value or volatility of any security or group of securities."  As such, Plaintiff argues that the Swap Agreement is in fact a security-based swap agreement, and is therefore not exempted from the purview of § 10(b) and Rule 10b-5.   Contrary to Plaintiff's argument, LIBOR, as its title indicates, is an interest rate, and is therefore not an index based on the "price, yield value, or volatility of any security or any group of index of securities."  See http://www.bba.org.uk/bba/jsp/polopoly.jsp?d=225&a=1416 ("Libor stands for the London Interbank Offered Rate and is the *rate of interest at which banks borrow funds*, in marketable size, in the London interbank market.").[8]  Thus, because Plaintiff has not alleged facts demonstrating

---

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2004).

[8]The Court may judicially notice this fact, as stated by the British Bankers' Association, which is charged with compiling the LIBOR.  Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000) (Federal Rule of Evidence 201 permits a judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

that the Swap Agreement here is security-based, Plaintiff's claims under the Exchange Act must be dismissed.[9]

### H.      Unfair Competition and False Advertising

Count III of the Complaint seeks damages for violation of the "New Jersey Business and Professions Code" for failure to disclose the existence of a prepayment penalty, and how this penalty would be calculated.  This count, like the rest of the counts in the Complaint, is based on Plaintiff's allegations that "Wachovia, in connection with the services it provided, has caused to be published false and misleading statements regarding the Swap that it knew or in the exercise of reasonable case should have known to be false and misleading."  Compl. at ¶ 56.

---

[9] Moreover, even if Plaintiff had alleged facts to show that the Swap Agreement was security-based, which it has not, Plaintiff has utterly failed to comply with the pleading requirements for claims brought under the Exchange Act.  Since claims brought under § 10(b) and Rule 10b-5 are fraud claims, plaintiffs must comply with the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  Rockefeller, 311 F.3d at 216. Allegations of securities fraud also must satisfy the specific pleading requirements of the PSLRA, 15 U.S.C. § 78u-4 et seq.  The Private Securities Litigation Reform Act ("PSLRA") both supplements and supersedes Rule 9(b) by imposing additional, heightened pleading requirements on claims of securities fraud.  See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 531 (3d Cir. 1999).  Under the PSLRA, a complaint alleging violations of § 10(b) and Rule 10b-5 must:  (1) specify each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading and, (3) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed.  15 U.S.C. § 78u-4(b)(1).

In addition, under the PSLRA, the complaint must "state *with particularity* facts giving rise to a *strong* inference that the defendant acted with "scienter."  15 U.S.C. § 78u-4(b)(2) (emphasis added).  As the Third Circuit has noted, in Rule 10b-5 actions, this requirement supersedes the provisions of Rule 9(b) to the extent that rule would otherwise permit state of mind to be averred generally.  Advanta, 180 F.3d at 531 n.5.  If a complaint fails to comply with the specific pleading requirements of the PSLRA, dismissal of the complaint is statutorily mandated.  15 U.S.C. § 78u-4(b)(3)(A).  Plaintiff's Complaint does not even begin to address these requirements.

Not surprisingly, Plaintiff fails to provide a statutory citation in either the Complaint or opposition brief to any New Jersey statute addressing the acts of unfair competition and false advertising addressed herein, because no such Code exists in New Jersey specific to the acts alleged.  As such, Plaintiff fails to state a claim upon which relief can be granted, and this claim shall therefore be dismissed.

## IV.     CONCLUSION

For the reasons discussed herein, Defendant's Motion to Dismiss is hereby GRANTED as to Counts I, II, III, IV, V, and VII.  Defendant's Motion to Dismiss is GRANTED WITHOUT PREJUDICE as to Count VI.  Plaintiff is given leave to amend the Complaint with regard to the calculations of the termination fee only, and not as to the validity of imposition of a fee, within thirty (30) days.  An appropriate order will follow.

/s/ Freda L. Wolfson
Honorable Freda L. Wolfson
United States District Judge